**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SUNNY HANDICRAFT (H.K.) LTD.** | ) | |
| **and BIN TEH HANDICRAFT** | ) | |
| **(SHENZHEN) CO. LTD.,** | ) | |
| | ) | |
| **Plaintiffs/Counter-Defendants,** | ) | **14 C 1512** |
| | ) | |
| **v.** | ) | **Judge John Z. Lee** |
| | ) | |
| **ENVISION THIS!, LLC,** | ) | |
| | ) | |
| **Defendant/Counter-Plaintiff,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **WALGREEN CO. and** | ) | |
| **BETH ANN EDWARDS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Sunny Handicraft (H.K.) Ltd. ("Sunny") and Bin Teh Handicraft (Shenzhen) Co. Ltd. ("Bin Teh") manufactured and shipped holiday merchandise worth approximately $3.4 million to Defendant Walgreen Co. ("Walgreens") for its 2013 Christmas retail season. Defendant Envision This!, LLC ("Envision") facilitated the transaction and transmitted order forms and payment information. On the forms it sent to Walgreens confirming the purchase, Envision listed itself—instead of Sunny—as the intended recipient of Walgreens's letters of credit. As a result, Envision received letters of credit from Walgreens worth approximately $3.8 million. Envision then drew on approximately $3.06 million from the letters. Plaintiffs have never received any payment for the merchandise.

A jury found in Plaintiffs' favor on their claims for breach of contract, fraud, and defamation against Envision, and defamation against Defendant Beth Ann Edwards (one of the

principals of Envision). The jury also found in Plaintiffs' favor on Envision's counterclaims for breach of contract, tortious interference with prospective economic advantage, and defamation.

Plaintiffs' two remaining equitable claims are now ripe for resolution. As to Count II, unjust enrichment against Walgreens, the Court finds in favor of Plaintiffs in the amount of $426,636.29. As to Count VI, breach of fiduciary duty against Envision, the Court finds in favor of Envision. This opinion resolves all claims remaining in this case. Prior to entering judgment, however, the Court will set a briefing schedule for Plaintiffs' motion for prejudgment interest.

## <u>Procedural History</u>

This case, filed in March 2014, has a lengthy procedural history, including three rounds of motions to dismiss and one hotly contested set of cross-motions for summary judgment. The Court presumes familiarity with its prior opinions in this case, and in the now-consolidated case Plaintiffs brought against Envision's owners Beth Ann Edwards and Robert Hetzler. *See Sunny Handicraft (H.K.) Ltd. v. Edwards*, No. 16-cv-4025 (N.D. Ill. filed Apr. 5, 2016) ("the '16 case").

The parties proceeded to a jury trial in February 2018. At that point, Plaintiffs' claims were as follows: breach of contract against Walgreens (Count I); unjust enrichment against Walgreens (Count II); breach of contract against Envision (Count III); unjust enrichment against Envision (Count IV); fraud against Envision (Count V); breach of fiduciary duty against Envision (Count VI); defamation against Envision (Count VII); and defamation against Edwards (Count III in the '16 case). Envision also maintained counterclaims for breach of contract (Count I); tortious interference with business advantage (Count V); and defamation (Count VII). *See* Final Pretrial Order at 5, ECF No. 250.

Prior to trial, the Court determined that Plaintiffs' unjust enrichment and breach of fiduciary duty claims (Counts II, IV, and VI) were equitable in nature and, therefore, could not be

resolved by a jury. *See* Mem. Op. & Order of 2/6/18, ECF No. 247. Accordingly, those claims were stayed, and a jury trial was held as to Plaintiffs' and Envision's remaining legal claims.

At the conclusion of the trial, the jury found in Plaintiffs' favor as to all of their claims against Envision and Edwards, but in favor of Walgreens as to Plaintiffs' contract claim. *See* Order of 2/28/18, ECF No. 261. The jury also found in favor of Plaintiffs as to all of Envision's counterclaims. *See id.* The jury awarded $3,069,631.37 in compensatory damages for Envision's breach of contract, $400,000.00 in compensatory damages for Envision's fraud, $903,890.00 in punitive damages for Envision's fraud, and $10,000.00 in compensatory damages for Edwards's defamation. *See id.* Although the jury found in Plaintiffs' favor as to their defamation claim against Envision, it did not award any damages as to that claim. *See id.*

The parties have submitted proposed findings of fact and conclusions of law as to Plaintiffs' remaining equitable claims for unjust enrichment against Walgreens (Count II) and breach of fiduciary duty against Envision (Count VI).[1] Furthermore, Plaintiffs have moved for prejudgment interest as to the claims on which they have already prevailed and expressed their intent to seek prejudgment interest as to their equitable claims as well. *See* Mot. Prejudgment Interest, ECF No. 304.

### Standard of Decision

Where an action is "tried on the facts without a jury," Federal Rule of Civil Procedure 52 requires the district court to "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a); *see Khan v. Fatima*, 680 F.3d 781, 785 (7th Cir. 2012). In doing so, the

---

[1] Plaintiffs have indicated that they no longer wish to pursue their claim for unjust enrichment against Envision (Count IV), given the fact that the jury found their relationship with Envision to be governed by contract. *See* Joint Status Report at 1, ECF No. 269.

district court must "explain the grounds" for its decision and provide a "reasoned, articulate adjudication." *Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008).

In rendering its decision on the remaining equitable claims in this case, the Court has considered the admissible testimony and documentary evidence offered at trial. In so doing, the Court has considered the weight to be given to the evidence and has assessed the credibility of the witnesses in light of their demeanor; their ability to see, hear, and know the matters about which they testified; and any potential for bias. Furthermore, the Court has considered the memoranda and proposed findings of fact submitted by the parties and the legal and factual arguments set forth therein. Finally, in ruling on the equitable claims, the Court "is bound both by [the] jury's explicit findings of fact and those findings that are necessarily implicit in [its] verdict." *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, 790 F. Supp. 2d 708, 722 (N.D. Ill. 2002) (quoting *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 912–13 (10th Cir. 2004)); *see also Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*, 356 F.3d 731, 735 (7th Cir. 2004) ("[T]he jury's determination of factual issues common to both the legal and equitable claims . . . bind[s] the court.").

### The Trial

At trial, Plaintiffs called four fact witnesses: Shengwen ("Daniel") Huang, the general manager of both Bin Teh and Sunny; Hetzler; Edwards; and Karl Waldschmidt, who in 2013 was the manager of import operations and administration at Walgreens. In turn, Defendants called six fact witnesses: Edwards; James Osborne, a category manager at Walgreens; Waldschmidt; Hadieh Hasan, director of merchandising for Walgreens; Huang; and Hetzler.[2] Finally, each side read into the record certain deposition testimony, including from Daniel Huang's brother, Frank.

---

[2] Both sides also submitted expert witnesses to opine as to Envision's lost profits as relevant to its counterclaims against Plaintiffs. The expert witnesses bear no relevance to the remaining equitable claims.

## I. Daniel Huang

Huang testified first and explained the nature of Bin Teh's and Sunny's businesses. The two businesses work together to manufacture and export holiday decorations and other seasonal merchandise; Bin Teh manufactures the goods, and Sunny ships them to retailers. *See generally* Trial Tr.[3] at 12–14, 26–28. Huang explained that, beginning in 2006 or 2007, Plaintiffs began working with Envision to arrange regular shipments of holiday merchandise to U.S. retailers, including Walgreens. *See generally id.* at 35–37. Huang described the manner in which this relationship functioned in the years prior to 2013, including how Plaintiffs compensated Envision and how Walgreens paid Plaintiffs for the merchandise. *See generally id.* at 37–116, 173–74, 221–22.

Then, Huang gave his account of what happened during the 2013 transaction. According to Huang, Walgreens issued purchase orders of $3,496,267.66 for merchandise that Bin Teh manufactured and Sunny shipped. *See generally id.* at 219–20. Walgreens guaranteed payment for these orders by issuing letters of credit. Huang, as usual, emailed to Envision forms listing Sunny as the intended beneficiary of Walgreens's letters of credit, but Envision surreptitiously altered the forms to list Envision as the beneficiary. *See generally id.* at 127–146, 210, 218–21.

When he did not receive the letters of credit, Huang testified, he repeatedly asked Envision about their status, believing that he was still to receive them, but Envision misled him by assuring him that everything was fine when, in fact, Envision had arranged to receive the payments for itself. *See generally id.* at 147–48, 174–201, 211–26. Huang explained that he became concerned about the lack of payment and took certain actions to try to rectify the situation, such as delaying

---

[3]     The trial transcript is consecutively paginated but broken up into six separate volumes. The page ranges can be found as follows: 1–266 at ECF No. 263; 267–467 at ECF No. 264; 468–702 at ECF No. 265; 703–998 at ECF No. 266; 999–1172 at ECF No. 267; 1173–1259 at ECF No. 268.

shipping and contacting Hasan at Walgreens for assistance. *See generally id.* at 201–10, 254–56, 287–96, 307–09. According to Huang, Plaintiffs were never paid for the 2013 merchandise that they provided to Walgreens. *See id.* at 220:7-12.

## II. Robert Hetzler

Hetzler, who handles the financial side of Envision's business, *see id.* at 926:3-21, testified as to his understanding of the 2013 transaction. Hetzler stated that two manufacturers—Bin Teh and Innovative Lighting (or "ILIL")—were to produce the merchandise. *See generally id.* at 432–40. Because of this, Hetzler testified, Envision and Huang agreed in January 2013 that the letters of credit would be issued to Envision so that it could direct the appropriate payment to the two manufacturers, as necessary. *See generally id.* Hetzler testified that he changed the forms sent to him by Huang to reflect that agreement. *See generally id.* at 376–87. He further testified as to his communications with Huang and Walgreens representatives concerning the letters of credit. *See generally id.* at 376–403, 946–47. Finally, Hetzler described Envision's business with Huang over the years, including how Plaintiffs would compensate and cover Envision's expenses. *See generally id.* at 932–43.

## III. Beth Edwards

Edwards, who is married to Hetzler and handles the product-development side of Envision's business, recounted her view of Envision's relationship with Plaintiffs and Walgreens. *See generally id.* at 596–646, 658–60. She also testified as to Envision's communications with Huang and Walgreens concerning the 2013 transaction, the letter-of-credit issue, and the delayed shipping of some of the merchandise. *See generally id.* at 514–24, 650–57, 681–89, 691–93.

## IV.    Karl Waldschmidt

Waldschmidt testified that his job at Walgreens involved handling overseas shipping of merchandise to the U.S. and the creation of letters of credit to pay for that merchandise. *See generally id.* at 541–42.  He testified that Envision was Walgreens's vendor, and described the process that occurred with respect to the 2013 transaction, including payment and shipping. *See generally id.* at 544–62, 583–87, 755–68, 776–86.  Furthermore, he explained how he assisted Envision in drawing on the letters of credit after they had initially expired. *See generally id.* at 565–69, 571–82.

## V.    James Osborne

Defendants called Osborne, who met with Huang in November 2013, after most of the events pertaining to the 2013 transaction had taken place. *See id.* at 747:5-7.  The meeting's purpose, Osborne testified, was to review seasonal items. *See id.* at 748:1-2.  But, Osborne explained, Huang told Osborne that Walgreens should stop working with Envision.  This shocked Osborne, and he ended the meeting. *See id.* at 748:5-20.

## VI.    Hadieh Hasan

Hasan testified regarding Walgreens's relationship with Envision as well as with Plaintiffs. *See generally id.* at 790–808, 844–51.  Hasan further testified about her communications with the parties during the 2013 transaction; she explained that Huang called her about the letter-of-credit issue and that she then encouraged the parties several times to work the payment issue out among themselves. *See generally id.* at 808–32.  Finally, Hasan testified, her experience with the shipping delays and other problems with the 2013 transaction caused her to drop Envision as a supplier. *See generally id.* at 855.

## VII.  Frank Huang

Defendants presented deposition testimony of Frank Huang, the sales manager for Sunny and Bin Teh.  *See id.* at 1130:7-16.  During his deposition, Frank explained how his brother Daniel instructed Expeditors International, the shipping company used by Plaintiffs, to withhold documents required to ship some of the 2013 merchandise.  *See generally id.* at 1131–42.

### <u>Findings of Fact as to Equitable Claims</u>

1.      Sunny, a Hong Kong corporation, and Bin Teh, a China corporation, work together in the business of manufacturing and exporting holiday decorations and other seasonal merchandise for U.S. retailers.  Final Pretrial Order, Ex. C, Stipulations and Uncontested Facts ("Stip.") ¶ 1, ECF No. 250.  Bin Teh manufactures the goods and Sunny coordinates shipments to retailers.  *Id.* ¶ 4.  Daniel Huang operates both companies as general manager.  *Id.* ¶ 5.

2.      Envision is a Florida limited liability company, and its sole members are husband and wife, Robert Hetzler and Beth Ann Edwards.  *Id.* ¶ 6; Trial Tr. at 333:11-17.  Envision sources goods from overseas factories for sale to U.S. retailers.  Stip. ¶ 6.

3.      Walgreens is an Illinois corporation that owns and operates retail stores that sell prescription drugs, health and wellness products, photo services, and other items, including seasonal holiday decorations.  *Id.* ¶ 7.

4.      From 2007 to 2013, Plaintiffs and Envision worked together to arrange regular shipments of holiday merchandise to various U.S. retailers, including Walgreens.  *Id.* ¶ 8; Trial Tr. at 36:20-24.

## I.  Prior Course of Dealing Between the Parties

5.      From 2007 to 2012, Plaintiffs manufactured and shipped merchandise to Walgreens, which Walgreens paid for by issuing letters of credit made out to Sunny.  Trial Tr. at

365:5-11, 367:8-20, 556:8-11; *see* Trial Tr. at 42:2-22, 59:2–61:4, 65:10–66:4, 343:2–345:16; PEX 28 (6/13/07 email).

6.     Envision initiated these transactions.  Through Edwards, Envision would meet with representatives of Walgreens to discuss trends, packaging, and other design and product needs. *See* Trial Tr. at 637:8–639:10, 642:9–643:11, 790:18–793:12, 801:12–802:14.  Edwards would then design the products and inform Bin Teh of the specifications for each one. *See id.* at 597:16-22, 612:17–613:1, 613:25–614:21, 615:8-10, 615:24–617:17, 618:4-7.  Edwards would coordinate "buy trips" for representatives of Walgreens to visit Bin Teh's factory, meet with Huang, and discuss the products. *See id.* at 639:6–642:7, 643:8–645:25, 793:17–798:20, 802:17–804:24.  The fact that Walgreens dealt primarily with Envision when it came to designing and ordering products is supported not only by Edwards's testimony, but also that of Waldschmidt and Hasan. *See, e.g.*, *id.* at 755:18–756:3, 790:18–793:12, 793:17–799:5, 801:12–802:14, 802:17–805:11, 807:8-12, 820:11-19, 844:13–845:4.

7.     Once the design process was completed, Envision would facilitate the paperwork needed for Walgreens to order the products from Plaintiffs.  First, Envision would submit to Walgreens an "Import Offer Sheet" listing quotes for specific products.  Trial Tr. at 242:23–244:7, 272:11-13, *see e.g.*, DEX 58 (11/18/09 Import Offer Sheet).  Each Import Offer Sheet submitted during the relevant time period listed Envision as the "vendor" and "Peter Handicraft Co Ltd" (another name for Bin Teh) as the "factory."  Trial Tr. at 244:4-19, 245:23–246:14; *see, e.g.*, DEX 58 (11/18/09 Import Offer Sheet).

8.     Based on the quotes, Walgreens would then submit "Purchase Orders" to Envision.  Trial Tr. at 116:7-14, 272:14-16, 756:10-18.  Every Purchase Order submitted during the relevant

time period listed Envision as the vendor and Bin Teh as the manufacturer. *Id.* at 246:21–247:18, 756:10-18, 806:15–807:12, 918:2-25, 919:1-7.

9. Then, to consummate the Purchase Orders, Envision would send to Walgreens a "Confirmation Form"—typically prepared or reviewed by Plaintiffs—that detailed the quantities, pricing, and payment information for the products Walgreens wanted. Trial Tr. at 64:9-20, 72:8-73:6, 76:11–77:17, 340:23–341:23, 342:20–343:4, 344:4-18, 346:2-24, 355:18–356:8, 357:17–358:8, 362:6–363:6, 363:24–364:22, 370:16-24, 372:6-22, 374:13-23; *e.g.*, PEX 29, 30 (5/21/07 Confirmation Forms), PEX 31 (6/18/08 Confirmation Form), PEX 32 (10/21/08 Confirmation Form), PEX 33 (5/18/09 Confirmation Form), PEX 34 (8/10/09 Confirmation Form), PEX 35 (4/5/11 Confirmation Form), PEX 36 (4/5/12 Confirmation Form), PEX 37 (6/27/12 Confirmation Form).

10. For the most part, these forms listed Envision as "U.S. Vendor," Sunny as "Overseas Vendor," and Sunny as the letter-of-credit beneficiary. *See, e.g.*, Trial Tr. at 64:9-17, 72:8–73:6, 76:11–77:17, 340:23–341:23, 342:20–343:4, 344:4-18, 354:22–355:1, 355:5-16, 356:3-5, 357:17–358:8, 362:6–363:6, 363:24–364:22, 367:17-20; PEX 29, 30 (5/21/07 Confirmation Forms), PEX 31 (6/18/08 Confirmation Form), PEX 32 (10/21/08 Confirmation Form), PEX 33 (5/18/09 Confirmation Form), PEX 34 (8/10/09 Confirmation Form), PEX 35 (4/5/11 Confirmation Form), PEX 36 (4/5/12 Confirmation Form), PEX 37 (6/27/12 Confirmation Form).

11. Plaintiffs set the prices for the goods and handled shipping. Trial Tr. at 365:10-12, 1123:17-20. Envision never took ownership or possession of the merchandise—in other words, it did not buy Plaintiffs' goods and resell them to Walgreens. *Id.* at 365:13–366:22, 367:5-7, 1125:7-10. Rather, Plaintiffs compensated Envision for its role in the transactions by paying it a

commission based upon the amount of gross sales; Plaintiffs also agreed to reimburse Envision for product development and travel expenses. *Id.* at 37:5-19, 477:14-24, 618:8–619:19, 619:22-24, 1125:14-20. The commission fell somewhere between three and six percent. *See id.* at 37:17-20, 950:20–951:15. At the end of each year, Plaintiffs and Envision would have a "true-up" meeting to determine how much either party owed the other. *See id.* at 692:4-9, 928:20–929:11.

12. Based on the record, the Court finds that, in writing and over the course of the parties' dealing, Plaintiffs and Envision entered into a contract whereby: (1) Envision agreed to design products and facilitate Plaintiffs' negotiations with Walgreens; (2) Plaintiffs agreed to manufacture and ship the goods; (3) Plaintiffs agreed to compensate Envision through payment of a commission and other expenses and fees; and (4) Plaintiffs and Envision agreed that Plaintiffs would be compensated directly by Walgreens. The contract contemplated that Envision was to deal directly with Walgreens, including facilitating Walgreens's payments to Plaintiffs. Under the contract, Envision was not responsible to Plaintiffs for the cost of the merchandise.[4] *See supra* ¶¶ 6, 9–10.

13. As a matter of course, Walgreens negotiated and communicated with Envision, not Plaintiffs. *See* Trial Tr. at 755:18–756:3, 790:18–793:12, 793:17–799:5, 801:12–802:14, 802:17–805:11, 807:8-12, 820:11-19, 844:13–845:4. Walgreens considered Envision to be its "vendor," in other words, the company from which it purchased merchandise. *Id.* at 755:18–756:3, 772:9-11, 778:8-17, 789:3-5, 794:10-12, 804:16-20, 807:2-10, 847:4-7. Walgreens did not care what factory Envision used to "source" the merchandise, so long as the factory met its quality control and ethical standards. *Id.* at 805:3-11, 820:13-22. Walgreens paid for the merchandise by

---

[4] This finding is supported by the verdict on Plaintiffs' breach of contract claim against Envision, wherein the jury awarded damages in the amount that Envision drew from Walgreens's 2013 letters of credit ($3,069,631.37), as opposed to the entire purchase price for the 2013 merchandise ($3,496,267.66).

following the directions provided by Envision on the Confirmation Forms listing the letter-of-credit beneficiary. *See supra* ¶ 9.

14.     Based on the totality of the record, the Court finds that Plaintiffs did not hire Envision to represent them as a sales agent. Envision did not have authority to set prices for Plaintiffs and did not take direction from Plaintiffs as to how to market the goods to Walgreens. *See* Trial Tr. at 365:10-12, 617:25–618:6, 1123:17-20.

15.     Furthermore, Walgreens was aware of Plaintiffs' involvement in its orders from Envision. From 2007 to 2012, Walgreens paid Sunny directly for the merchandise as provided on the Confirmation Forms sent to it by Envision. Trial Tr. at 367:8–20. And over the years, Walgreens visited Plaintiffs' factories several times and communicated with Plaintiffs concerning quality audits and shipping. *See id.* at 97:17–99:4, 99:25–100:20, 100:22–101:23, 482:15–483:16, 484:2–485:25, 487:10–488:1, 488:21–489:3, 554:24–555:1, 784:15–785:9; *e.g.,* PEX 3 (9/15/12 email), PEX 10 (7/28/13 email), PEX 17 (chart of scheduled meetings).

## II.     The 2013 Transaction

16.     In July 2012, Edwards presented merchandise concepts for the 2013 holiday season to Walgreens at its offices in Deerfield, Illinois. Trial Tr. at 637:8-17. Plaintiffs did not participate in Edwards's product discussions. *Id.* at 637:21–638:9, 643:5-7.

17.     In 2013, Walgreens issued Purchase Orders for Christmas merchandise with a face value of $3,496,267.66. *Id.* at 219:23-25.

18.     As in previous years, Huang emailed Confirmation Forms to Envision, each listing Sunny as the letter-of-credit beneficiary. PEX 57, 58, 60, 65 (4/25/13 Confirmation Forms with Sunny as Beneficiary), PEX 62, 66 at 1 (6/26/13 Confirmation Forms with Sunny as Beneficiary).

19.     Despite this, Envision ultimately sent to Walgreens Confirmation Forms that listed Envision as the letter-of-credit beneficiary.  Stip. ¶ 12; PEX 66 at 2, 67, 68 (6/26/13 Confirmation Forms with Envision as Beneficiary).

20.     Because Envision listed itself as the letter-of-credit beneficiary, Walgreens caused three letters of credit, in the total amount of $3,834,684.57, to be issued to Envision's benefit.  Stip. ¶ 13; Trial Tr. at 548:15–549:3, 571:15–572:9; PEX 162 (7/24/13 Letter of Credit), PEX 163 (8/2/13 Letter of Credit), PEX 164 (9/16/13 Letter of Credit).

21.     From May through early August 2013, Huang repeatedly reached out to Envision to ask when the letters of credit would be issued, still believing they would be issued to Sunny.  Stip. ¶ 14; Trial Tr. at 379:25–380:20, 387:5–388:15, 393:24–395:3, 396:24–398:8; *see* PEX 69 (7/22/13 email); PEX 74 (7/30/13 email); PEX 76 (8/8/13 & 8/7/13 emails).

22.     Hetzler and Edwards never told Huang during this time that the letters of credit would not be made out to Sunny.  Trial Tr. at 379:25–380:20, 387:5–388:15, 393:24–395:3, 396:24–398:8.  Even after the letters of credit were posted, Envision told Plaintiffs that the letters of credit had not yet been issued.  *See id.* at 389:11-25, 393:24–395:3, 396:24–398:8.

23.     On August 8, 2013, Envision informed Plaintiffs that the letters of credit had gone to Envision.  PEX 77 (8/13/13 & 8/8/13 emails).  Hetzler emailed Huang: "Daniel, Just got a copies of these, and unfortunately it went to my bank."  *Id.*  He told Huang that he did not think the letters of credit were transferable.  *Id.*

24.     Soon thereafter, Hetzler met with a representative from Citibank, who told him that the letters of credit in fact were transferable.  Trial Tr. at 408:25–409:24.  Despite this, Hetzler never transferred the letters of credit to Sunny or informed Huang that the letters were transferable.  *Id.*

25.     Envision also told Huang that Walgreens does not reissue letters of credit. *Id.* at 399:14–400:7.   But this was false, as Waldschmidt testified that, if a beneficiary was listed incorrectly, it would have been possible to amend the letters of credit or to cancel and reissue them. *Id.* at 581:9–582:3.

26.     While communicating with Envision about the letters of credit in August 2013, Huang became concerned about being paid and, hoping to force payment, misrepresented to Envision that he needed money to pay a supplier for light sets. *See* Trial Tr. at 191:1–192:19; PEX 77 (8/13/13 email).  Huang also asked Envision for an advance or a loan of between $450,000 and $700,000 to pay for the light sets.  *See* Trial Tr. at 681:25–684:11; DEX 75 (8/1/13 email). Edwards and Hetzler told Huang that they would obtain these funds for him, but they did not do so. *See* Trial Tr. at 681:25–684:11.

27.     Furthermore, Envision promised Huang that it would obtain a $1.5 million letter of credit to compensate Plaintiffs; however, it never issued such a letter. *See* Trial Tr. at 499:11-21, 684:16–685:10; PEX 83 (8/20/13 email).

28.     Based on the record, the Court finds that Envision changed the letter-of-credit beneficiary on the Confirmation Forms sent to Walgreens without Plaintiffs' knowledge or permission.  The Court does not find credible Hetzler's and Edwards's testimony that they agreed with Huang in January 2013 that the letters of credit would be issued to Envision.  *See id.* at 431:10–432:20, 439:14–440:7, 651:22–652:25, 654:16-25.   This testimony particularly lacks credibility given the fact that neither Hetzler nor Edwards ever mentioned such an arrangement in subsequent communications about the letters of credit. *See id.* at 379:25–380:20, 387:5–388:15, 393:24–395:3, 396:24–398:8.   The Court instead credits Huang's testimony that Envision did not

tell him until August 2013 that the letter-of-credit beneficiary would be different than in prior years. *See id.* at 148:12-19, 174:21–175:2.

29.    Furthermore, the Court finds that Envision intentionally misled Plaintiffs to believe that the letters of credit were merely delayed instead of issued to the wrong party and that Envision intentionally obfuscated the truth in order to induce Plaintiffs to ship the goods without a guarantee of payment.   The Court does not find significant the fact that Huang left off Sunny's banking information from the Confirmation Forms.[5]   *See* Def. Envision's Proposed Findings of Fact ("PFOF") ¶ 32, ECF No. 300.

30.    By August 20, 2013, some of Plaintiffs' merchandise had shipped.   *See* PEX 103 (2013 merchandise ship dates).   Concerned by the lack of payment, Huang called Hasan and told her that the letters of credit should have been issued to Sunny, not Envision.   Stip. ¶ 17; Trial Tr. at 204:16–205:15, 206:15–208:2, 810:19–813:1.   He told Hasan that the merchandise would be on hold until the letters of credit were issued to Sunny.   Trial Tr. at 810:19–813:1.[6]

31.    Hasan responded by telling Huang that the issue was between him and Envision, and that he should not "drag[ ]" Walgreens into it.   *Id.* at 812:15-25.

32.    Hasan then emailed Envision on August 21, 2013, explaining that Huang had told her that "orders [were] on hold" until the letters of credit could be transferred to Sunny.   PEX 84 (8/21/13 emails).   Hasan told Edwards to resolve the issue and questioned why the letters of credit did not list Sunny as the beneficiary.   *Id.*

---

[5]    The Court's finding that Envision misled Plaintiffs is further supported by the jury's verdict that Envision is liable for defrauding Plaintiffs.

[6]    As to this point, the Court finds Hasan's testimony more credible than Huang's testimony, given the fact that Huang followed through with withholding shipments after the call.   *See infra* ¶ 32.

33.     Hasan emailed Sunny on August 23, 2013.  PEX 150 (8/23/13 email).  She stated that it was "very late" to be making changes to shipments "including LC and vendor setup."  *Id.* Furthermore, she explained that she had "asked both . . . Sunny . . . and Envision [to] work out their differences without disrupting [Walgreens's] business," and that Sunny and Envision needed to "come to terms" on how to operate their partnership without her involvement.  *Id.*

34.     Huang continued in September 2013 to withhold documentation necessary to ship some of the remaining merchandise.  Trial Tr. at 287:15–288:17, 288:22–289:13; *see generally id.* at 1131–42.

35.     Hasan wrote to Envision on October 9, 2013, explaining that she would not tolerate any further delays.  DEX 29 (10/9/13 email).

36.     Plaintiffs—through counsel—sent a letter on October 10, 2013, to Hasan, expressing that 80% of the products had been received by Walgreens's forwarder, but that Plaintiffs had not received payment.  PEX 161 (Broida & Nichele letters).  Hasan forwarded this letter to Walgreens's legal department.  *Id.*; Trial Tr. 891:3-17.

37.     Hasan emailed Envision again about the shipping delays on October 13, 2013.  PEX 151 (10/13/13 Hasan email).  She explained that she was upset that the letter-of-credit issue had not been resolved between Envision and Plaintiffs, and that she "should have really taken Daniel serious[ly] when he was stressing things will not go well if LC weren't changed to his company name."  *Id.*

38.     Edwards responded to Hasan's email, stating: "As for Daniel at this point this is just pure Chinese thievery, gangsters. . . .  It is one continual lie upon lie on their end.  Their actions are completely unethical and our lawyers are handling."  PEX 185 (10/13/13 Edwards email).

39.     The 2013 merchandise was custom-made and custom-packaged for Walgreens, so Huang decided that there was no other option but to ship it to Walgreens regardless of the payment issues.  Trial Tr. at 210:14–211:10.  By November 20, 2013, all of the merchandise had arrived at Walgreens's distribution centers.  Stip. ¶ 20.

40.     Plaintiffs sent another letter through counsel on November 25, 2013, this time to Walgreens's Litigation Department, explaining that the entire order had been shipped and was being sold at Walgreens stores.  PEX 161 (Broida & Nichele letters).  The letter further explained that Plaintiffs had not received payment and demanded that no payments be made to any entity other than Plaintiffs.  *Id.*

41.     On November 26, 2013, a Walgreens employee responded to an email from Hetzler concerning the letters of credit.  PEX 129 (11/16/13 email).  At that time, the letters of credit had expired without Envision having drawn on them.  Trial Tr. at 575:13–579:1.  But Walgreens agreed to honor the letters of credit and to help Envision gather the documentation necessary to present to the bank.  *Id.* at 568:18–569:12, 580:3-21; PEX 129 (11/16/13 email).

42.     Subsequently, Envision drew down $3,069,631.37 from the Walgreens letters of credit.  Stip. ¶ 18.   It has not paid Plaintiffs any amount of these funds.  *Id.* ¶ 20.  Nor has Walgreens paid anything to Plaintiffs for manufacturing and shipping the merchandise.  *Id.*

43.     Walgreens did not reject the merchandise, and in fact made it available for sale during the 2013 holiday season.  *Id.* ¶¶ 21–22.

44.     Because of the delays and litigation resulting from the 2013 transaction, Walgreens (through Hasan) decided to stop working with Envision.  Trial Tr. at 855:5-21.

## Analysis & Conclusions of Law

Before the Court are Plaintiffs' two remaining equitable claims. In Count II, Plaintiffs allege that Walgreens was unjustly enriched by taking possession of the goods from the 2013 transaction without ever paying Plaintiffs anything for them. In Count VI, Plaintiffs allege that Envision breached fiduciary duties it owed to Plaintiffs as their sales agent. The parties do not dispute that Illinois law governs both claims.

## I. Unjust Enrichment as to Walgreens

Plaintiffs argue that Walgreens was unjustly enriched because it obtained the value of the 2013 merchandise without ever paying Plaintiffs for it. Walgreens argues that Plaintiffs' remedy is under their contract with Envision, and that they were justly compensated for any contractual injury by the jury verdict in their favor as to their legal claims. Furthermore, Walgreens argues that its only obligations were to Envision, and that it discharged those obligations by posting the letters of credit.

### A. Availability of a Remedy for Unjust Enrichment

A claim for unjust enrichment in Illinois requires the plaintiff to show that "valuable services or materials were furnished by the plaintiff, received by the defendant, under circumstances which would make it unjust for the defendant to retain the benefit without paying."[7] *Hayes Mech., Inc. v. First Indus., L.P.*, 812 N.E.2d 419, 426 (Ill. App. Ct. 2004); *see also Macon*

---

[7] It is unclear whether, under Illinois law, unjust enrichment is itself an independent claim, or whether it is a remedy based on a claim for breach of a contract implied in law. *See GlaxoSmithKline Biologicals, S.A. v. Hospira Worldwide, Inc.*, No. 13 CV 4346, 2016 WL 5720384, at *10 n.13 (N.D. Ill. Sept. 30, 2016) (collecting cases); *see also C. Szabo Contracting, Inc. v. Lorig Const. Co.*, 19 N.E.3d 638, 644 (Ill. App. Ct. 2014) ("Unjust enrichment is not an independent cause of action but a remedy that can be based on, among other theories, a contract implied in law, otherwise known as a quasi-contract."). The parties do not address this issue, however, and Walgreens does not argue that Plaintiffs lack a valid cause of action.

*Cty., Ill. v. MERSCORP, Inc.*, 742 F.3d 711, 713–14 (7th Cir. 2014). To prevail on the claim requires proof that the defendant's retention of the benefit "violates the fundamental principles of justice, equity, and good conscience." *Cleary v. Phillip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)). Courts also generally require proof that the plaintiff had a reasonable expectation of payment for the benefit conferred on the defendant. *See Midcoast Aviation, Inc. v. Gen. Elec. Credit Corp.*, 907 F.2d 732, 740 (7th Cir. 1990)). The measure of damages for such a claim focuses on "the benefit received and retained" by the defendant. *Hayes Mech., Inc.*, 812 N.E.2d at 426.

Because a claim of unjust enrichment implies a contract in law to avoid injustice, it is necessarily a claim for which "no actual agreement exists between the parties." *C. Szabo*, 19 N.E.3d at 644. Accordingly, a remedy is not generally available for unjust enrichment "in the face of an express contract." *Id.* at 645; *see also Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 571 (7th Cir. 2016) ("When two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract.") (internal quotation marks and citation omitted); *Blythe Holdings, Inc. v. DeAngelis*, 750 F.3d 653, 658 (7th Cir. 2014) ("[W]here there is a specific contract that governs the relationship of the parties, the doctrine [of unjust enrichment] has no application.") (quoting *People ex rel. Hartigan v. E & E Hauling, Inc.*, 607 N.E.2d 165, 177 (Ill. 1992)).

Walgreens argues that two contractual relationships in this case preclude Plaintiffs' claim for unjust enrichment: the relationship between Plaintiffs and Envision, and the relationship between Envision and Walgreens. As to the relationship between Plaintiffs and Envision, Walgreens points to the jury verdict in this case. The jury found in favor of Plaintiffs on their claim against Envision for breach of contract. Walgreens correctly points out that such a verdict

necessitates a finding that a contract existed between Plaintiffs and Envision. Accordingly, Walgreens contends, Plaintiffs' only mode of recovery for the cost of the goods is through its contract with Envision. As a corollary to this, Walgreens argues that it was obligated only to Envision, through the exchange of Purchase Orders and Confirmation Forms. Walgreens contends that its actions were guided exclusively by those forms, which in 2013 indicated clearly that Envision was responsible as the vendor of the goods and that it was to be paid for those goods.

Under Walgreens's theory, Envision functioned as a general contractor hired by Walgreens to provide merchandise for the 2013 holiday season, and Plaintiffs were akin to subcontractors hired by and answerable only to Envision. Walgreens points to cases in which Illinois courts have held that a subcontractor's remedy for nonpayment lies only with the general contractor, given the existence of agreements between the subcontractor and the general and between the general and the ultimate purchaser. For instance, in *Vanderlaan v. Berry Construction Co.*, Vanderlaan, a subcontractor, was hired by Berry, the principal contractor for work to be done for the owners of real estate. 255 N.E.2d 615, 616 (Ill. App. Ct. 1970). The Illinois Appellate Court held that Vanderlaan could not sue the owners for a balance due on the subcontract, because he had a remedy through his contract with Berry, and because "the owner has the right to presume that [subcontracted] work is being done for and in behalf of the [general] contractor." *Id.* at 617. A similar result was reached in *Hayes*, which involved a contractor who sued the landlord of property for which it had done work, despite the fact that his contract was with the tenant. *See* 812 N.E.2d at 421, 426–28 (holding that a claim for unjust enrichment cannot be brought against a third party where the crux of the problem is the plaintiff's disappointment by its "co-party's failure to pay" pursuant to a contract).

For their part, Plaintiffs argue that they were not subcontractors; instead, they contend, Envision was Plaintiffs' sales agent, and the only real agreement was for Plaintiffs to provide goods and for Walgreens to pay for them. Of course, if that were true, the jury would have accepted Plaintiffs' claim for breach of contract against Walgreens. Instead, the jury found that Walgreens did not breach an agreement with Plaintiffs, despite the fact that it never paid Plaintiffs for $3.4 million worth of goods it received from them.

That said, Walgreens's theory also misses the mark. First, although the relationship between the parties was certainly similar to that of a general and subcontractor, it differed from the relationships in *Vanderlaan* and *Hayes*. In both of those cases, there were contracts that specifically governed payment for the plaintiffs' work. Here, although the jury found a contract between Plaintiffs and Envision, its verdict does not establish that the contract required Envision to cover the cost of Plaintiffs' goods.

The amount of the verdict—$3,069,631.17—is telling. That verdict corresponds to the funds that Envision drew down from Walgreens's letters of credit, not the negotiated value of the goods, which was $3,496,267.66. If the jury had believed that Envision's contractual obligation was akin to that of a general contractor—in other words, that it was solely and entirely responsible for Plaintiffs' compensation—it would have awarded Plaintiffs the full value of the goods, or $3,496,267.66. Instead, the jury's verdict reflects that Envision's obligation under its agreement with Plaintiffs was to facilitate payment between Walgreens and Plaintiffs, including turning over any money that Walgreens mistakenly paid to it instead of Plaintiffs. Accordingly—at least as to the difference between the value of the goods ($3,496,267.66) and the amount awarded by the jury ($3,069,631.17)—Plaintiffs have no contractual remedy against Envision.

Furthermore, even if Envision had acted as a general contractor between Plaintiffs and Walgreens, Illinois law would not categorically preclude Plaintiffs' unjust enrichment claim. Instead, as the Illinois Appellate Court described in *C. Szabo*, the availability of an unjust enrichment claim against a stranger to a contract turns on (1) the risk of double recovery or double liability, (2) the assumption of risks provided for by the contract, and (3) "the rights of choice and personal autonomy" of the defendant. *See* 19 N.E.3d at 648–50; *see also RehabCare Grp. E., Inc. v. SAK Mgmt. Servs., LLC*, No. 09 C 4523, 2010 WL 3307084, at *3 (N.D. Ill. Aug. 18, 2010) (collecting cases and explaining that, where a contract governs the relationship between two parties, Illinois law does not preclude recovery for unjust enrichment against a third party).

Here, just as in *C. Szabo*, the factors weigh in favor of allowing Plaintiffs some recovery from Walgreens. First, there is an amount—the difference between the value of the goods and the money that Envision drew from Walgreens's letters of credit—that Walgreens has never paid anyone. As to that amount at least, there is no risk of double recovery on the part of Plaintiffs or double liability on the part of Walgreens. Furthermore, as already described, although Plaintiffs had an agreement with Envision, Plaintiffs did not assume the risk that Envision might fail to pay them for their services. Rather, the risk they assumed was that Envision might err in routing Walgreens's payment to them. Finally, requiring Walgreens to make Plaintiffs whole "results in no unfairness or forced exchange," because Walgreens will only be required to pay for "the exact service it requested at the price it agreed to pay." *C. Szabo*, 19 N.E.3d at 649.

Walgreens agreed to purchase $3,496,267.66 worth of goods, and agreed to pay the letter-of-credit beneficiary listed on the Confirmation Forms. Plaintiffs provided those goods, and it is now established that Sunny should have been listed as the beneficiary. Furthermore, Plaintiffs reasonably expected to be paid for the goods based on their prior dealings with Envision and

Walgreens, Envision's representations to them, and the fact that they fully performed their obligations to manufacture and ship the goods. Yet Walgreens has only ever paid $3,069,631.17 of the contracted price for the goods. It would violate ordinary good conscience and principles of justice to allow Walgreens to walk away with $426,636.49 in free merchandise, particularly when it was well aware of Plaintiffs' claim to payment and their dispute with Envision. Despite this knowledge, Walgreens insisted that Plaintiffs ship the goods to Walgreens without any assurance of payment. Compounding the unfairness of this situation is the fact that Plaintiffs have never received *anything* for the goods, even though Walgreens made the merchandise available for sale in its stores during the 2013 holiday season. Although the blame for the nonpayment does not rest entirely with Walgreens, it is reasonable to hold the company accountable for its own unpaid bill.

This conclusion does not require, as Walgreens suggests, that the Court find that it assisted Envision in defrauding Plaintiffs. Even if Walgreens committed no wrongdoing in this transaction, a remedy for unjust enrichment is available if the defendant's retention of the benefit "violates the fundamental principles of justice, equity, and good conscience." *Cleary*, 656 F.3d at 516. Here, these principles would be violated by allowing Walgreens to retain goods for free despite its specific agreement to pay for them. *See C. Szabo*, 19 N.E.3d at 649–50. Nor need the Court find that Walgreens "knew" it had an obligation to pay Plaintiffs instead of Envision; it is enough that it agreed to pay for the goods, and has not fully done so. *See id.*[8]

---

[8] Walgreens also argues that Plaintiffs' only available remedy is the imposition of a constructive trust against Envision. The Court will not separately address this argument, which essentially repeats the assertion that Plaintiffs' contract claim against Envision provides their only source of relief.

### B.    Damages

The parties advocate for different damages amounts.  Plaintiffs argue that Walgreens should pay the entire value of the goods, or $3,496,267.66; in the alternative, they ask for the unpaid value of the letters of credit, or $765,063.40.  Walgreens asks that Plaintiffs be awarded no more than $216,860.23, which essentially corresponds to the unpaid value of the goods ($426,636.49) less Envision's purported six percent commission ($209,776.06).[9]

First, the Court rejects Plaintiffs' request for the full value of the goods.  As earlier described, the measure of recovery is the amount the defendant has unjustly retained, not the amount that Plaintiffs have lost.  *See Hayes Mech., Inc.*, 812 N.E.2d at 426.  Furthermore, the jury has already awarded Plaintiffs more than the full value of the goods from Envision.  Even if Envision is insolvent and will never be able to pay the jury verdict, awarding Plaintiffs the full amount of the goods from Walgreens would subject Walgreens to double liability—a significant concern for purposes of awarding equitable relief.  *See C. Szabo*, 19 N.E.3d at 648.

Plaintiffs' alternative request for $765,063.40 raises a question that has gone unanswered in this litigation.  Plaintiffs apparently agree that the value of the goods—and the amount Walgreens agreed to pay for them—was $3,496,267.66.  *See* Pls.' PFOF ¶ 20, ECF No. 272; 3d Am. Compl. ¶ 44 ("Walgreens agreed to pay Plaintiffs a total of $3,496,267.66 for the goods . . . ."), ECF No. 124.  Yet the letters of credit Walgreens sent to Envision were for $3,834,684.57.  Plaintiffs do not attempt to explain this discrepancy, yet they seek the entire unpaid value of the letters of credit.  But with no information as to why Plaintiffs would be entitled to over $330,000 more than the purchase value, the Court declines to award that amount.  It is true that, had Plaintiffs been named on the letters of credit instead of Envision, they might have been

---

[9]    Walgreens's figure is twenty cents less than this calculation, which actually equals $216,860.43.

able to draw on the full $3.8 million. But, again, the purpose of the unjust enrichment claim is to disgorge benefits that Walgreens has unjustly retained; as the Court has already explained, that amount is the unpaid value of the goods Walgreens received. If some other obligation required Walgreens to pay $330,000 more, Plaintiffs has not presented any basis for that argument.

The Court also rejects Walgreens's request to subtract Envision's purported commission payment from the damages award on this claim. Even if Envision was entitled to a commission for the 2013 transaction, it is inexplicable why Walgreens would be entitled to retain those funds.

Accordingly, the Court finds in favor of Plaintiff and against Walgreens as to Count II and awards $426,636.29 in damages.

## II. Breach of Fiduciary Duty as to Envision

Plaintiffs' Count VI alleges that Envision was their sales agent in the transactions with Walgreens and, thus, violated its fiduciary duties in the course of the 2013 transaction. For damages, Plaintiffs seek the entire value of the 2013 merchandise—$3,496,267.66. Envision argues that it was not Plaintiffs' sales agent and owed them no fiduciary duties. Furthermore, it argues that even if it had such duties, it either did not breach them or Plaintiffs cannot recover for the breach due to their own bad conduct.

A plaintiff may recover for breach of fiduciary duty where (1) a fiduciary duty exists on the defendant's part; (2) the defendant breached the fiduciary duty; and (3) damages resulted from the breach. *See Romanek v. Connelly*, 753 N.E.2d 1062, 1072 (Ill. App. Ct. 2001). A fiduciary duty may arise as a matter of law due to the parties' relationship, such as between principal and agent. *See Ransom v. A.B. Dick Co.*, 682 N.E.2d 314, 321 (Ill. App. Ct. 1997); *see also Khan v. BDO Seidman, LLP*, 948 N.E.2d 132, 151–52 (Ill. App. Ct. 2011). It also may arise "as a result

of the special circumstances of the parties' relationship, where one party places trust in another so that the latter gains superiority and influence over the former." *Ransom*, 682 N.E.2d at 321.

Parties to a contract do not owe a fiduciary duty to each other merely by virtue of the contract. *See Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 280 (7th Cir. 1992). But a fiduciary relationship may develop between contracting parties. Factors to consider include "the degree of kinship between the parties; the disparity in age, health, mental condition and education and business experience between the parties; and the extent to which the 'servient' party entrusted the handling of its business affairs to the 'dominant' party and placed trust and confidence in the 'dominant' party." *In re Estate of Bontkowski*, 785 N.E.2d 126, 132 (Ill. App. Ct. 2003); *see also Benson v. Stafford*, 941 N.E.2d 386, 398 (Ill. App. Ct. 2010) ("The 'essence' of a fiduciary relationship is dominance of one party by the other.").

Plaintiffs argue that Envision had a fiduciary duty to them by virtue of its status as their "sales agent" in the transactions with Walgreens. But, as noted above, the Court finds that Envision was not Plaintiffs' sales agent. "An agency relationship has two components: 1) the principal has the right to control the manner and method in which the agent performs work for her, and 2) the agent has the power to subject the principal to personal liability." *Peterson v. H & R Block Tax Servs., Inc.*, 971 F. Supp. 1204, 1213 (N.D. Ill. 1997) (citing *Knapp v. Hill*, 657 N.E.2d 1068, 1071 (Ill. App. Ct. 1995)).

Here, the totality of the evidence shows that Envision negotiated with Walgreens on its own behalf and worked with Plaintiffs to meet its own manufacturing and shipping obligations. Plaintiffs did not have the ability to control the way Envision did business with Walgreens; nor did Envision have the ability to bind Plaintiffs with respect to obligations such as pricing or shipping. *See supra* at ¶¶ 6–12. Furthermore, Plaintiffs did not hire Envision to work as a sales

agent; instead, Envision decided to do business with Plaintiffs after independently negotiating with Walgreens. *See id.* The mere fact that payment was structured to flow from Walgreens directly to Plaintiffs does not change this conclusion; instead, it simply reflects the fact that Plaintiffs bore all of the manufacturing and shipping costs. This situation is quite similar to *Kozasa v. Guardian Electric Manufacturing Co.*, where the Illinois Appellate Court concluded that the plaintiff—a designer of goods and middleman between the manufacturer and distributor—was not an agent of the manufacturer. *See* 425 N.E.2d 1137, 1140–41, 1144 (Ill. App. 1981). Here, Envision functioned much like the plaintiff in *Kozasa*, incurring its own obligations to both the manufacturer (Plaintiffs) and the retailer (Walgreens), rather than acting as an agent for either side. The fact that the plaintiff in *Kozasa* stepped back after bringing the distributor and manufacturer together is not dispositive, *see id.* at 1144; if anything, these facts make the *Kozasa* plaintiff more like an agent than Envision, which assumed an active role in the transaction as Walgreens's vendor.

Nor has Plaintiff pointed to any other facts creating a fiduciary duty on Envision's part. Both Plaintiffs and Envision were sophisticated businesses with years of experience in the industry. And although Plaintiffs trusted Envision to handle the collection of payment for their goods, they also took an active role in this process, checking in with Envision regularly about the status of payment and participating in the yearly "true-up" process. *See supra* ¶¶ 6–12. Plaintiffs have pointed to nothing to suggest that they were at a severe disadvantage in relation to Envision or that Envision occupied a particularly special role with respect to Plaintiffs' business. *See Benson*, 941 N.E.2d at 398. Accordingly, the Court finds that Envision owed no fiduciary duty to Plaintiffs.

Because Envision owed Plaintiffs no fiduciary duty, it could not have breached such a duty. Accordingly, Plaintiffs' claim for breach of fiduciary duty fails, and the Court need not address

Envision's remaining arguments. Judgment is entered against Plaintiffs and in favor of Envision as to Count VI.

## Conclusion

As to Count II, the Court finds in favor of Plaintiffs and against Walgreens and awards Plaintiffs $426,636.29 in damages. As to Count VI, the Court finds against Plaintiffs and in favor of Envision. Plaintiffs are given until October 18, 2019, to file a renewed motion for prejudgment interest including all claims on which they seek such interest. Defendants' response to the motion will be due November 1, 2019. No reply is necessary.

**IT IS SO ORDERED.**                    **ENTERED: 9/27/19**

_____
**JOHN Z. LEE**
**United States District Judge**